UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )
                             )
v.                           )  Case No. 1:24-CR-41-SNLJ-ACL
                             )  Case No. 1:23-CR-47-SNLJ-ACL
ANTWAN T. DAVIS,             )
                             )
              Defendant.     )

**<u>REPORT AND RECOMMENDATION</u>**

This matter is before the Court[1] on Defendant Antwan Davis' Motions to Suppress Evidence (Doc. 32), Compel (Doc. 33), and Dismiss (Doc. 34) in Case No. 1:24-CR-41.

Davis is charged with being a previously convicted felon in possession of a firearm on March 18, 2024.  At that time, he was on a term of supervised release after having been convicted of Possession with Intent to Distribute 5.8 ounces of Marijuana in the Eastern District of Texas.  In addition to the pending Indictment, the Defendant faces revocation of his supervised release.  Davis also filed Motions to Suppress (Doc. 27) and Compel (Doc. 28) in the supervised release case, No. 1:23-CR-47.

On the evening of March 18, ShotSpotter technology utilized by the Sikeston Department of Public Safety (DPS) registered six shots fired in the vicinity of Davis' backyard.  A Sikeston DPS officer, Lt. Scott Kim, proceeded to the location identified by

---

[1] Pretrial matters have been referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

ShotSpotter, which led him inside Davis' backyard.  Lt. Kim walked halfway across the yard while shining his flashlight on the ground.  He did not observe any injured person or other items that may have been related to the gunfire.  Next, Lt. Kim immediately began searching for shell casings.  As other officers arrived, Lt. Kim instructed them to look for shell casings and to not contact the homeowner.

One minute after Lt. Kim passed through the carport, Davis came out of the residence to see what was going on.  Within another minute the first shell casing was found.  Two more casings were located over the next 80 seconds.  Ten minutes after the officers arrived, Lt. Kim asked Davis if he would consent to the officers taking the shell casings they found in his backyard.  No one asked Davis if they could search his yard for spent casings.  A Search Warrant was secured based on the ShotSpotter report, casings found in Davis' backyard, and Davis' criminal history.  A gun and ammunition were seized during the execution of the Search Warrant.

Davis contends that the officer entered his "backyard to search for evidence of a crime and not based on any exigent circumstance" thereby making the search illegal. (Doc. 32 at 4.)  Davis claims that the accuracy of the ShotSpotter technology has "very real limitations" and "no reasonable police officer would respond to a ShotSpotter alert believing that the alert identified the true location- or even the right city block- of a noise event." *Id*. at 10.  Davis further argues that "the casings w[ere] not discovered during a search for injured persons."  (Doc. 49 at 4.)  Lastly, Davis argues that since the search warrant "issued for his home relied on both the ShotSpotter technology and the results of

the illegal search of his backyard, any evidence gathered as a result of that search was 'fruit of the poisonous tree' and must be suppressed."  (Doc. 27 at 10.)

The Government initially responded that Davis' claim "that the officers' entry into his backyard violated the Fourth Amendment" is without merit.  (Doc. 41 at 4.)  Adding that the alert that six shots had been fired in Davis' backyard gave "the officers…a legitimate concern for public safety and a duty to confirm that no injured person was either in Davis' yard or inside his home."  *Id*. at 6.

Three officers testified at the evidentiary hearing.  Both parties submitted exhibits including body camera recordings from two officers, information related to ShotSpotter, and photographs.

Following the evidentiary hearing, the Government asserted that the Court need "go no further than simply applying the good-faith exception to adjudicate Davis' motion, the totality of the circumstances clearly establish that the officers' conduct was nevertheless reasonable under the Fourth Amendment."  (Doc. 53 at 8.)  Furthermore, the Government asserted that 'the officers' pre-warrant conduct was 'close enough to the line of validity' to make [their] belief in the validity of the warrant objectively reasonable." (Doc. 58 at 23-24, citations omitted.)  The Government added that Davis, by his actions, impliedly consented to the search of his backyard when he found the officers searching it. More particularly, the Government stated that subjective consent is not the precise question, but whether Davis' conduct would have caused a reasonable officer to believe the person consented.  The Government further claims that Davis explicitly and

voluntarily consented to the seizure of the casings when Lt. Kim asked, "do you mind if we collect the casings right there?"

Davis disagrees with the Government's assertion that Davis consented, first noting that it is an argument that was not previously raised by the Government. Davis replied that no officer who testified "believ[ed] that this was a consent search or that [consent] was the reason [Lt. Kim] believed he was justified in his actions." (Doc. 56 at 8.)

Following the traditional post-hearing briefing, the undersigned requested further supplemental briefing and oral argument. This matter has been extensively argued and is ripe for consideration.

The undersigned recommends that the Motion to Suppress be granted in the new Indictment case and denied in the supervised release case based on the findings of fact and conclusions of law set out below. In consideration of these recommendations, it is further recommended that the Motions to Compel and Dismiss be found moot.

## I. Findings of Fact

Around 8:45 p.m., on March 18, 2024, a new gunfire detection system (ShotSpotter) utilized by the Sikeston Department of Public Safety registered six shots fired at 1336 McDougal Street. The first officer on the scene was Lt. Scott Kim. He parked his patrol car a distance from the area identified by ShotSpotter and made his way toward 1336 McDougal on foot. As is typical of an investigation of a shooting incident, Lt. Kim was on the lookout for any vehicles or people that might be fleeing the area. He saw neither but encountered one bystander who stated that she was in the shower. She

also believed the sound came from the next street. *See* Gov't Ex. #9 (Lt. Kim's body camera video at 01:10).

Viewing the ShotSpotter cell phone application (app), Lt. Kim made his way to the area identified by the app. He testified that the app is used "to find the location of the shell casings and see if anyone is injured." (Tr. 40.[2]) The primary area highlighted in the ShotSpotter app was Davis' home located at 1336 McDougal in Sikeston. There were lights on inside the residence and two vehicles parked in the driveway. Lt. Kim walked up the driveway and under the carport around a parked vehicle. He did not stop at the home's entry door under the carport rather walked along the outside of the house and entered a partially open gate[3] that led to the backyard.



(**Image 1**: Screenshot from Gov't Ex. #9, Lt. Kim's body camera video at 02:18.)

Lt. Kim testified that when using the ShotSpotter app, "[t]he first thing we do is scan for anyone hurt." (Tr. 60.) He conducted a quick scan of the southeastern quadrant

---

[2] Pages in the Suppression Hearing Transcript (Doc. 46) are referred to as "Tr. ___."
[3] The Government acknowledges that Lt. Kim went inside the curtilage of the residence.

of the backyard.  He did not shine a light on any other area in the yard including the shed.

Nor did he conduct a perimeter search of the residence.  It was immediately apparent that

no person was in the backyard.  As to why he didn't search the entire yard or the shed, Lt.

Kim explained:

> …from three prior experiences from shots fired they were pretty effective.
> I went to the general area, scanned around to see if I can see if there's any,
> …people…that looked like they were injured or…needed help or whatnot.
> I didn't see that.
>      And then I started looking more into the casing[s]…

(Tr. 61.)

After the brief scan for anyone in peril, Lt. Kim focused his attention on the

ShotSpotter app and the ground.  Another officer arrived on scene and asked, "Lt., you want

me to make contact with this house?"  Gov't Ex. #9 at 02:40.  Lt. Kim replied, "Not just yet,

it should be right here.  Look on the floor for casings… Should be right at our feet."



(**Image 2**:  Screenshot from Gov't Ex. #9 at 02:50, officers scouring the grass.)

The pair searched the ground for thirty seconds before Davis calls out from the house, "What's going on?" *Id*. at 03:14. Another officer who had arrived on scene answered, "There was shots fired in your backyard." *Id*.

After Davis exited his home and made his way to the side of the residence, Lt. Kim seemingly ignored Davis' presence as he was focused on finding the spent casings. Instead of acknowledging Davis, Kim addresses another officer on the scene about the image displayed on the ShotSpotter app and states "Let's look, it should be right around here somewhere." *Id*. at 03:22. Lt. Kim continues to study the ShotSpotter app while another officer asks Davis if he heard the shots fired. Davis said he did. The officer then asks whether Davis is in "a beef" with anyone to which Davis answers, "Hell, no. I'm on Fed papers."



(**Image 3**: Screenshot from Gov't Ex. #9 at 03:14, depicting the ShotSpotter app's highlight of the likely location of casings.)

Still disinterested in Davis, Lt. Kim shows the ShotSpotter app to a fourth officer and enlists his help to search the ground for casings. *Id*. at 03:43. When the officer agrees to

help, Lt. Kim finally addresses Davis by asking his name. *Id.* at 03:49.  Although Kim asks Davis if they could go inside "real quick," an officer calls out that a "rifle round" was found.

Distracted by the discovery of a casing, Lt. Kim redirects his attention to the search in the backyard.  He instructs the officers to keep searching as there should be a total of six casings. *Id.* at 04:15.  A second casing was found. *Id.* at 04:25.  At this point, Lt. Kim advised the dispatcher that casings had already been located.  By this time, Davis entered the backyard. *Id.* at 04:28.  Still focused on locating the spent shell casings, Lt. Kim states "It's right here, but just to be diligent, look over there, too. But, I'm pretty sure it's right here. There should be six…Sikeston, it's gonna be in the backyard of 1336…" *Id.* at 05:00. Shortly thereafter, a third casing is found. *Id.* at 05:20.  Around that time, Davis uses the light on his cell phone to see what's on the ground. *Id.* at 05:30.

Lt. Kim continues to be uninterested in Davis' presence and talks to another office about getting "the little numbers" to mark the location of the spent casings that had been found.  Kim decides to retrieve the numbers himself and walks away from the scene.  Before leaving, he orders Davis to stand in the area of the garage while the officers "investigate real quick." *Id.* at 05:35.  Davis followed Lt. Kim's instruction.

Next, Lt. Kim walks away from the scene and contacts his commanding officer to report the status of the investigation. *Id.* at 08:20.  After providing the basic details about shots having been fired at Davis' residence, Lt. Kim explains that "we're gonna see if he'll let us voluntarily just look through his cars and his, what do you call, the house..." *Id.* at 08:35.  After an inaudible question from the commander, Lt. Kim states that the casings were found about ten feet inside the backyard.  The commanding officer's next question is barely audible, he asks Lt. Kim, "…how did you get to the shell casings?" *Id.* at -8:55.  Lt. Kim

states, "I looked at, what do you call it, ShotSpotter. The backyard fence was open, and I just went, walked straight to the dots…" *Id*. at -8:58. The commanding officer's next statement cannot be heard. Lt. Kim responds, "Oh, and that was my…I'll make sure he has no problem with us being there…" *Id*. at 09:12. After additional instruction from the commander, Lt. Kim assures the commander that they'll make sure there's no one else inside the residence.

Nearly five minutes after leaving Davis on the carport, Lt. Kim returns to the residence. The following exchange occurs:

Kim: Hey, Mr. Davis, can you come over here real quick? Okay, we ca-, we came right over here. …You know, we saw the casings, uh, we're trying to figure out what's going on with the casings.

Davis: I understand.

Kim: You know. My question is, be honest, did you possibly, just, pop out some rounds in the air?

Davis: Hell, no.

Kim: I'm not saying… I have to ask these questions.

Davis: No, sir.

Kim: Okay.

Davis: I'm on fed papers. I'm on federal parole.

Kim: Okay, so what did you hear? Tell me what—

Davis: I heard the gunshots, I did. I was listening to music. I was cleaning my house. Then I heard, Pop, pop, pop. I'm like, damn, what the hell is that? I come outside and I look around and it ain't nothin'. So, I come back in the house.

Kim: Hey, guys [three officers inside backyard and one officer outside the gate], step out over here for a second. [To Davis] Okay, do you mind if we collect the casings right there?

Davis:  You c-c-can, you…yeah, yeah [laughs], get the mother f-ckers.

Kim:   Okay, so you give us permission?

Davis:  Yes, sir.

*Id*. at 10:08-11:18.

Another officer then asks Lt. Kim if he has the numbers to mark the casings.  Kim leaves the scene again to retrieve the numbers from his patrol car.  When he returns and gives the cards to another officer, Lt. Kim comments "Mr. Davis gave us permission to collect it…." *Id*. at 12:14.  He then speaks to Davis again.

Kim:   Mr. Davis, come over here for a second….  My other questions is, I know you're on paper what not, but because it happened right here, you know.  I appreciate you letting us collect them, but you know, we're probably gonna, because it happened right on your property…And, you know, we didn't see any cars drive off, or whatnot, we're probably gonna get a search warrant.

Davis:  Well, that's fine.

Kim:  You have no problem with it.

Davis:  Yeah, get a search warrant

Kim:  No, I mean, you know.  I'm just being honest.

Davis: Yeah, that's fine.

Kim:   Have you ever…  I'm a straight shooter.

Davis: Yeah.

Kim:   You know. N-, there's no firearms in your…

Davis:  There's no firearms nowhere around here.

Kim:  Okay.  I appreciate that.

Davis: Most definite.

Kim:   You know.  Uh, what are you on paper for?

>    Davis:  Uh, weed
>
>    Kim:  Okay.  That's it?
>
>    Davis: That's it.  Weed.

*Id*. at 12:17-13:12.

Once again, Lt. Kim steps away from the scene and contacts his commanding officer who instructed Lt. Kim to conduct a protective sweep of the residence.  Lt. Kim returns to Davis and asks, "is there anyone else in the house?"  *Id*. at 15:55.  Davis responds that his girlfriend is inside.  He also agrees that it's okay for the officers to check that no one else is present.  The protective sweep was completed within less than three minutes.  During the evidentiary hearing, Lt. Kim testified that the purpose of the walkthrough was that he "just wanted to make sure that there was nobody shot."  (Tr. 44.)  Officers located three more shell casings in the backyard while the residence was being secured.  (Tr. 83.)

A Detective applied for a Search Warrant based on the ShotSpotter technology registering six shots as having been fired from the rear of Davis' residence, the discovery of shell casings in the backyard near the back door of the residence, along with criminal history information concerning Davis and his girlfriend, which made them both prohibited from possessing firearms.  Based on that information, a judge issued a Search Warrant for Davis' residence.  When it was executed, officers seized an AK-47 style rifle with a magazine containing 14 rounds of Wolf 7.62 ammunition that matched the spent casings recovered from the backyard, miscellaneous ammunition, and an additional magazine for a firearm.

At the time of the evidentiary hearing, Lt. Kim was employed by the Manchester Police Department, a job he started one month prior to the hearing.  He worked at Sikeston DPS for the previous 17 years.

Davis is charged with being a previously convicted felon in possession of a firearm.  The Probation Office filed a Petition for revocation of Davis' supervised release based on the evidence seized on March 18, 2024, and assorted Grade C (non-technical) violations.  Davis requests suppression of the evidence seized from his backyard and residence.

## II.  Discussion

As previously stated, Davis argues that there were no exigent circumstances present to justify Lt. Kim's warrantless entry into his backyard.  He claims the "sole purpose" of the entry into the backyard was to "search[ ] for evidence of a crime."  (Doc. 32 at 4.)  Next, Davis claims that even if the warrantless search was justified, "there was no probable cause for entering the backyard."  (Doc. 32 at 5.)  To support this assertion, Davis argues that "no reasonable officer would respond to a ShotSpotter alert believing that the alert identified the true location- or even the right city block- of a noise event." *Id*. at 10.  More specifically, Davis complains that body camera video shows the officers were looking for shell casings not people.  Post-hearing, Davis noted that "the purpose of entering the backyard is the keystone of th[e] analysis because the scope of any permissible search is limited to the permissible purpose of the warrantless entry onto the premises."  (Doc. 49 at 6.)

Following the suppression hearing, the Government asserted that Davis impliedly and expressly consented to a search of his backyard.  Alternatively, the Government argues that "even assuming arguendo that shining flashlights in the grass just a few seconds before Davis emerged from the house was somehow improper, his subsequent voluntary consent purged the taint of any purported Fourth Amendment violation."  (Doc. 58 at 11.) The Government further argues that suppression is not required under the good faith exception to the warrant requirement, because even if "the officers' conduct was somehow unreasonable for Fourth Amendment purposes," suppression is not required because the officers' prewarrant conduct was "close enough to the line of validity" for the officers to have an objectively reasonable belief in the warrant's validity.  *Id*. at 24.

Davis further disputes the Government's post-hearing assertions that the challenged seizures are valid based on his consent and good faith.

The undersigned finds that suppression is required in the Indictment case but not in the supervised release case based on the analysis below.

## II.A.  ShotSpotter

The parties did not cite, nor has the undersigned found an Eighth Circuit ruling involving a ShotSpotter alert.  The Seventh Circuit in *United States v. Rickmon* concluded that ShotSpotter alerts are analogous to an anonymous tip and can contribute to an officers' reasonable suspicion when corroborated by other sources of information describing the general area and nature of the same crime. 952 F.3d 876, 882 (7th Cir. 2020).  *See also United States v. Jones*, 1 F.4th 50, 53 (D.C. Cir. 2021) (Totality of circumstances supported officers' reasonable suspicion to stop individual one minute after ShotSpotter alert and

dispatch report of shots fired at location as he was only person on that block). Although the issue was not raised in the appeal, the *Rickmon* majority concluded that ShotSpotter alerts equate to a report of an "emergency." *Rickmon*, 952 F.3d at 883 ("inherent danger of gun violence sets shootings apart from other criminal activity").

In addressing ShotSpotter alerts where there was a reasonable suspicion challenge, a Massachusetts appellate court commented that "ShotSpotter alerts created an acoustic trail of breadcrumbs, from which it was reasonable to infer that the person responsible for the potential gunshots would be at or near the location where the ShotSpotter had last activated." *Commonwealth v. Ford*, 182 N.E.3d 1013, 1018 (2022) (multiple ShotSpotter alerts indicated a specific trajectory from various points, defendant was the only person in the area, and officers contacted defendant less than one minute after last ShotSpotter alert).

## II.B.   Curtilage

"The Fourth Amendment protects the right of the people to be secure in their homes against unreasonable searches and seizures. *United States v. Maxwell*, 89 F.4th 671, 676 (8th Cir. 2023). "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (alteration in original) (citation omitted).

"The area 'immediately surrounding and associated with the home—what our cases call the curtilage—is part of the home itself for Fourth Amendment purposes.'" *Luer v. Clinton*, 987 F.3d 1160, 1165 (8th Cir. 2021) (quoting *Florida v. Jardines*, 569 U.S. 1, 6

(2013)). "Where a legitimate law enforcement objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012).

In *Florida v. Jardines*, police approached Jardines' home with a drug sniffing dog and the dog began "energetically exploring" the area around his front door and then alerted at its base. 569 U.S. 1, 4 (2013). The Court found this area was a "classic exemplar" of curtilage. Discussing *Jardines* as it relates to a similar canine search, the Eighth Circuit noted that while "the officers had an implicit license to 'approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave,' they had no invitation to 'introduce a trained police dog to explore the area around the home in hopes of discovering incriminating evidence.'" *United States v. Hopkins*, 824 F.3d 726, 731 (quoting *Jardines*, 569 U.S. at 8.) The Court characterized the "investigation" by the canine an "'unlicensed physical intrusion' of the curtilage which violated the Fourth Amendment." *Id*. (quoting *Jardines*, 569 U.S. at 7.)

## II.C.   "Community Caretaker" and "Emergency Aid" Exceptions

The Eighth Circuit has described the "emergency or exigency doctrine" exception as follows:

> "…police officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of assistance. In applying this doctrine, two principles must be kept in mind. (1) Since the doctrine is an exception to the

ordinary Fourth Amendment requirement of a warrant for entry into a home, the burden of proof is on the state to show that the warrantless entry fell within the exception. (2) An objective standard as to the reasonableness of the officer's belief must be applied.

> " * * * [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.  * * *  And in making that assessment it is imperative that the facts be judged against an objective standard:
>
> > would the facts available to the officer at the moment of … the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)."

*United States v. Goldenstein*, 456 F.2d 1006, 1009-10 (8th Cir. 1972) (quoting *Root v. Gauper*, 438 F.2d 361, 364-65 (8th Cir. 1971)).

"Actions within [the] heartland of the community caretaker exception includes those taken to . . . provide an infinite variety of services to preserve and protect community safety." *Luer v. Clinton*, 987 F.3d 1160, 1166 (8th Cir. 2021) (quoting *Castagna v. Jean*, 955 F.3d 211, 221 (1st Cir. 2020)).  Examples of caretaking functions that fall under the exception include helping young children to cross busy streets, "navigating the sometimes stormy seas of neighborhood disturbances," and entering a home to abate the nuisance of loud music causing a late night peace disturbance.  *Id*. (citations omitted).

In *United States v. Chipps*, the Eighth Circuit held that law enforcement's observation of blood on the ground in front of a defendant's door provided exigent circumstances because the officer who observed the blood could reasonably have believed someone's life

was in danger.  410 F.3d at 442-44 (8th Cir. 2005).  *See also United States v. McGhee*, 129 F.4th 1095, 1101-02. (8th Cir. 2025) (officers responded to shots fired calls and observed eight shell casings in front of the house, which gave them reason to believe there was at least one victim triggering exigent circumstance exception); *United States v. Schmidt*, 700 F.3d 934, 937–38 (7th Cir. 2012) (concluding that warrantless search of a backyard to check for injured persons was permissible where officers responded to shots fired in the neighborhood and bullet holes and bullet casings were found in areas adjacent to backyard); *United States v. Huffman*, 461 F.3d 777, 781–86 (6th Cir. 2006) (finding that officers responding to reports of gunshots at a residence, who subsequently viewed bullet holes in the structure and received no response after knocking on the door, lawfully entered under the exigent circumstances exception to ensure nobody was injured inside).

While an officer may make a warrantless entry into a person's home or curtilage pursuant to the community caretaker or emergency aid exceptions, the intrusion "must be 'limited in scope to the extent necessary to carry out the caretaking function.'"  *Clinton*, 987 F.3d at 1166 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 275 (1976)).  In *Clinton*, a civil rights case, an officer searched for an individual who reportedly skipped paying the fare to his taxi driver in the area where the cab driver said the person fled. The officer "made only a limited search of outdoor places where the thief might be hiding, not a search inside the home from the vantage point of the curtilage."  *Id*.  The Eighth Circuit characterized the officer's search as a "sweep" of the area through which the fare skipper had fled and concluded it was an "arguably reasonable exercise of [the officer's] community caretaker function 'to preserve and protect community safety.'"  *Id*.

at 1167 (citation omitted; the panel clarified the officer's action "was a protective sweep of a neighborhood for complained-of community hazards, not unlike an inspection for outdoor property hazards").

The issue in *Clinton* was whether qualified immunity applied. The Eighth Circuit concluded that it was reasonable for the officer to look for the fare skipper in two yards, underneath a deck, behind an air conditioning vent, and within the open door of an attached garage. Subsequent entry into the residence, however, was unreasonable. That said, the Eighth Circuit clarified that "[t]he community caretaker exception does not apply where a 'law enforcement officer physically intrudes on the curtilage *to gather evidence*' of a crime." *Id.* at 1168 (quoting *Collins v. Virginia*, 584 U.S. 586, 593 (2018), emphasis added in *Clinton*).

## II.D.  Search for Shell Casings was Objectively Unreasonable

The Government relies on *Robbins*, supra, to support their position that Lt. Kim's search for casings in the grass was objectively reasonable. The facts of *Robbins* are distinguishable from this case. The officers in *Robbins* responded to a 911 call that they reasonably believed came from the Robbins' home. Upon their arrival, they proceeded down the driveway and through an open gate to the front door. They knocked on the door, but no one answered. The officers then "conducted a short, minimally intrusive exterior perimeter search and glanced at the windows for someone in need of assistance." *Robbins*, 682 F.3d at 1116. "To complete their good faith attempt to conduct a brief welfare check, they returned to knock again at the front door, at which point they noticed

the odor of marijuana, leading to the seeking of a search warrant." *Id*. This perimeter search was limited in nature and constitutionally reasonable.

Within 20 seconds of Lt. Kim entering Davis' backyard, he discerned that there was not an emergency. He did not observe any person or item that led him to believe there was a person in need of assistance or evidence of danger. Having determined there was not an emergency, Lt. Kim directed his full attention to locating spent shell casings. He advised the first backup officer to not contact the homeowner and instead instructed that officer and other officers to focus their attention on searching the grass for spent shell casings. The moment Lt. Kim cleared the area identified by the ShotSpotter app, the potential emergency *in that area* ceased. Had the spent casings been in plain view during his sweep of the backyard for anyone in distress or in need of assistance, the seizure of such casings would have been lawful. Searching through the grass in earnest was an investigation aimed at finding evidence related to the earlier shots fired. This investigation extended the scope of Lt. Kim's intrusion into Davis' backyard beyond the limits of what was reasonable.

In analyzing the reasonableness of Lt. Kim's actions, the Court notes that upon his initial approach to Davis' residence Lt. Kim did not observe any people, weapons, shell casings (spent or otherwise), indications of damage to the property in plain view, or any sounds consistent with an active emergency. The ShotSpotter app showed that the likely area of the shots fired was in the southeast quadrant of the backyard, which he could easily view by shining a flashlight over the fence. Perhaps most disconcerting is Lt. Kim's failure to check on the well-being of the home's occupants when it was clear no

one was in distress outside of the residence.  Lt. Kim also *left the residence* to secure evidence markers from his patrol car when he claims that he was responding to an emergency.  "This belies any bonafide claim of exigency and leads to the conclusion that the claim was really a pretext to enter upon [Davis'] property to investigate the true object of the investigation, which was not" locating a shooter or victim, but the location of spent shell casings.  *United States v. Wells*, No. 1:09CR00130, 2010 WL 2520525 at *3 (E.D. Mo. Jun. 14, 2010) (unpublished).

Although Lt. Kim's entry into the backyard was warranted for the limited purpose of confirming whether someone needed immediate aid, the scope of the intrusion became unreasonable when he began searching the ground for spent shell casings.  The intrusion into Davis' backyard was not properly limited based on the facts known to Lt. Kim.  The appropriate next step would have been to contact the homeowner as Officer Fobbs was inclined to do upon his arrival.

Based on the facts presented, the undersigned finds that Lt. Kim's warrantless entry into Davis' backyard was justified by exigent circumstances and the need to determine whether emergency aid was needed.  Within a matter of seconds, however, it was clear there was no need for Lt. Kim to harbor concern there was an emergency in the backyard.  At that point, he should have exited the backyard to confirm there was no one in danger inside the residence or around the perimeter of the house.  Instead, Lt. Kim initiated a search without contacting the homeowner and without a warrant.  Like the use of the drug sniffing dog at Jardine's front door, a physical intrusion to gather evidence in a backyard is presumptively unreasonable absent a warrant.  Lt. Kim abandoned his duty

to render aid to potential victims. He prioritized an unlawful search of the backyard and enlisted other officers to assist him in that unlawful search.

The undersigned finds that Lt. Kim's continued intrusion in Davis' backyard after completion of the protective sweep was not objectively reasonable.  Thus, the discovery and seizure of the casings in the backyard was violative of the Fourth Amendment. Consequently, for the reasons set out in the next section, the undersigned also concludes that the evidence seized pursuant to the Search Warrant for Davis' home (firearm, ammunition, and other items) is fruit of the poisonous tree.

Notwithstanding this conclusion, an analysis of the Government's alternative theories follows.

**II.E.   The Exclusionary Rule and Good Faith**

In *United States v. Leon*, the Supreme Court held that there is an exception to the exclusionary rule if "an officer acting with objective good faith has obtained a search warrant from a judge…and acted within its scope," even though a court were to later conclude that the warrant was invalid.  486 U.S. 897, 920 (1984).  For the good faith exception to apply to a warrant based on evidence obtained through a violation of the Fourth Amendment, "the detectives' *prewarrant conduct must have been close enough to the line of validity* to make the officers' belief in the validity of the warrant objectively reasonable."  *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir 2013) (emphasis added).

The exclusionary rule "is a judicially fashioned remedy whose focus is not on restoring the victim to his rightful position but on deterring police officers from

knowingly violating the Constitution." *United States v. Allen*, 625 F.3d 830, 836 (5th Cir 2010).  It "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144.  "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143.

Generally, the rule requires exclusion of evidence that is "directly" or "primarily" discovered as the result of an unlawful search.  Wayne R. LaFave, 6 SEARCH AND SEIZURE § 11.4 (4th ed. 2004).  When applied, it prohibits the "introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (internal citation omitted).

In *Hudson v. Michigan*, the Supreme Court cautioned that suppression should not be a court's first impulse.  547 U.S. 586, 591 (2006).  The *Hudson* Court further instructed that "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." *Id*. at 592.  It should not be applied to "nonculpable, innocent police conduct." *Davis v. United States*, 564 U.S. 229, 237 (2011).

> Real deterrent value is a necessary condition for exclusion, but it is not a
> sufficient one. The analysis must also account for the substantial social
> costs generated by the rule. Exclusion exacts a heavy toll on both the
> judicial system and society at large. It almost always requires courts to
> ignore reliable, trustworthy evidence bearing on guilt or innocence. And
> its bottom-line effect, in many cases, is to suppress the truth and set the
> criminal loose in the community without punishment. Our cases hold that
> society must swallow this bitter pill when necessary, but only as a last resort.

For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Davis v. United States*, 564 U.S. at 237 (quotations and citations omitted).

The Sixth Circuit emphasized that the "crucial finding" to support suppression is that the "'police [mis]conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010) (quoting *Herring v. United States*, 555 U.S. 135, 144). Evidence should be suppressed "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge that the search was unconstitutional under the Fourth Amendment." *Herring*, 555 U.S. at 143 (quoting *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987). *Herring* held that "[w]hen police mistakes leading to an unlawful search are the result of isolated negligence attenuated from the search, rather than systemic error or reckless disregard of constitutional requirements, the exclusionary rule does not apply. Even so, when the police act in good faith and "the facts surrounding the [ ] warrantless search [are] close enough to the line of validity to make the [ ] officers' belief in the validity of" their search "objectively reasonable," the *Leon* exception bars application of the exclusionary rule." *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005).

This case is distinguishable from cases in which the Eighth Circuit and other Circuits have concluded that "in certain circumstances, the good faith exception can overcome a taint from prior unconstitutional conduct." *United States v. Massi*, 761 F.3d 512, 525-28 (5th Cir. 2014) (collecting cases). It is also distinguishable from *United*

*States v. Fletcher,* 91 F.3d 48, 51–52 (8th Cir.1996), where the Eighth Circuit held that the *Leon* exception was applicable to the warrant-authorized search of a bag, even though the officers' initial detention of the bag to conduct a dog sniff violated the Fourth Amendment. The court explained that the circumstances surrounding both the initial detention of the bag, and the subsequent issuance of the warrant were "sufficiently close to the line of validity" that the officers had "an objectively reasonable belief that they possessed a reasonable suspicion such as would support the valid detention of [the] bag as well as an objectively reasonable belief that the warrant issued was valid." *Id.* at 52. *See also United States v. Kiser,* 948 F.2d 418, 421–22 (8th Cir.1991) (same); *United States v. White,* 890 F.2d 1413, 1419 (8th Cir.1989) (same); *United States v. Thomas,* 757 F.2d 1359, 1368 (2d Cir.1985) (holding *Leon* applicable to the subsequent warrant-authorized search of an apartment, even though the affidavit contained evidence obtained in violation of the Fourth Amendment, because the officer, who was acting in good faith, disclosed all information to the magistrate and had no reason to believe that his actions were unconstitutional); *McClain,* 444 F.3d 556, 566 (good faith exception applied as it was objectively reasonable for officers to suspect criminal activity was occurring in the home, there was no evidence that officers knew their protective sweep violated the Fourth Amendment, and officers who secured and executed search warrant were not involved in unlawful search, plus the affidavit fully disclosed the circumstance of the warrantless entry.)

The circumstances presented in this case are more akin to those found in cases where *Leon* was not applied.  *See United States v. Reilly,* 76 F.3d 1271, 1281–82 (2d

Cir.1996) (holding *Leon* inapplicable where officers seeking warrant acted in clear bad faith by failing to disclose to the magistrate in their warrant affidavit the circumstances surrounding a dubious pre-warrant search); *United States v. O'Neal,* 17 F.3d 239, 243 n. 6 (8th Cir.1994) (holding that a judge's issuance of a search warrant could not sanitize prior illegal conduct when the method by which evidence supporting the search warrant was seized was "clearly illegal").

Here, the intrusion into Davis' backyard exceeded the justification for Lt. Kim's entry.  His action of prioritizing investigation to recover shell casings over the safety of the community, other officers, and himself was violative of the Fourth Amendment. Lt. Kim placed the discovery of evidence above his duty to determine whether any person needed emergency aid.  His decision to do so was deliberate.

It was also objectively unreasonable for Lt. Kim to prioritize a warrantless search for shell casings over community safety.  The first backup officer's instinct was to contact the occupants in Davis' home to confirm no one was in danger or had been harmed; the gunman could have been inside holding individuals against their will, or injured persons could have been inside the residence.  Lt. Kim prevented the backup officer from determining whether anyone inside the residence was in danger.  The body camera video further supports that the commanding officer was concerned about how Lt. Kim managed the danger presented by the shots fired information.  He instructed Lt. Kim to clear the residence of any danger.  Even after that, Lt. Kim's focus remained on securing the three shell casings that had been located.  Lt. Kim did not confirm whether there was a threat posed to any person, or anyone injured inside the residence until nearly

14 minutes after the backyard was clear of danger.  In addition, it took Lt. Kim a total of

7 minutes from the time his commanding officer directed him to clear the residence, to do

so.  The facts surrounding Lt. Kim's warrantless search of the backyard were not close

enough to the line of validity to make belief in the validity of the search warrant

objectively reasonable.

What's more, the above information was not presented to the judge who

authorized the search of Davis' residence.  A plain reading of the Affidavit would lead

the reader to believe the shell casings were observed in plain view and not as part of an

intrusive search that was violative of the Fourth Amendment.  That omission resulted in

the reviewing judge being misled.  Additionally, removal of the information concerning

the unlawfully seized shell casings from the Affidavit results in a lack of probable cause.

To allow the information gathered from the unlawful search to provide the basis for

probable cause in the Search Warrant would render the exclusionary rule meaningless.

In these circumstances, the good faith exception to the warrant requirement does not

apply.

While exclusion is a bitter pill to swallow, the benefits outweigh the cost.  As

more law enforcement agencies adopt the use of ShotSpotter and similar technologies, it

is important for officers to understand the limits of the exigency or emergency aid

doctrine in responding to reports of shots fired.  Shots fired technology does not provide a

license to search for evidence.  The deterrence value of suppressing the evidence as to the

pending Indictment is worth the price paid by the justice system.  This is also a rare

scenario where the cost to society is lessened by virtue of the fact the evidence will not be

suppressed in Davis' supervised release case. Although he will not face the potential of a new criminal conviction absent the evidence that was seized, Davis may still be held accountable for the conduct as it relates to alleged violations of his supervision. This issue will be discussed further in Section II.F.

**II.E. Consent**

Next, the Government's argument that Davis consented to the search of his backyard will be addressed. The Government claims that an analysis of the totality of the circumstances supports a conclusion "that Davis freely consented to the officers' search for shell casings in his yard." (Doc. 58 at 8.) In support of this position, the Government submits Davis impliedly consented based on 1) Davis' statements indicating he was concerned about shots being fired in his backyard, 2) Davis did not "object to the officers' presence, or express any type of complaint concerning the officers looking for casings," 3) Davis didn't object to Lt. Kim's instruction for him to step aside while the officers continued searching for casings, 4) the encounter was not coercive or contentious as the interaction between Davis and the officers was conversational, and 5) Davis' mannerisms and interactions with the officers "demonstrates that any search for casings in [the backyard] was entirely consensual." *Id*. at 8-10.

As to Davis giving his express consent for the backyard search, the Government notes that when Lt. Kim asked if it was okay for the officers to "collect" the casings that had been located, Davis agreed the casings could be seized. The Government emphasized the fact Davis was on federal supervision and experienced with the criminal justice system. Plus, he agreed with Lt. Kim's announcement that a search warrant

would be secured to search the interior of his residence.  Based on these circumstances, the Government argues "the officers had an objectively reasonable basis to enter Davis' backyard."  *Id*. at 11.

Davis argues that a valid consent search requires an "unequivocal and specific consent to the search, uncontaminated by any duress or coercion, actual or implied."  (Doc. 56 at 8, quoting *Channel v. United States*, 285 F.2d 217, 219 (9th Cir. 1960)).  Based on the circumstances he faced, with three uniformed officers engaged in a search of his backyard that did not terminate upon his appearance, "Mr. Davis's words and actions cannot be seen as anything but an acquiescence to [the officers'] assertion of authority."  *Id*. at 10.  His "failure to specifically object to the show of authority" by the officers "searching his backyard cannot be considered consent."  *Id*. at 11.

Generally, "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen."  *United States v. Drayton*, 536 U.S. 194, 200 (2002).  That said, "acquiescence to police conduct that a reasonable person would have perceived as tantamount to a claim of lawful authority to search is not voluntary consent."  *United States v. Weidul,* 325 F.3d 50, 54 (1st Cir. 2003).  *See also United States v. Tovar-Rico,* 61 F.3d 1529, 1536 (11th Cir. 1995) ("Tovar opened the door in response to a 'show of official authority' and cannot be deemed to have consented to the agents' entry or to have voluntarily consented to the search").

As found in the preceding section, the emergency that justified Lt. Kim's initial entry into the backyard expired before Davis exited his residence to see what the police were

doing.  The situation in Davis' backyard was different than a consensual encounter with an officer on the street, or even at his front door.  By the time Davis appeared in the backyard, Lt. Kim had already confirmed there were no injured persons nor an active emergency.  Lt. Kim was engaged in a full-fledged search of Davis' backyard when Davis exited his home to see what was happening in his backyard.  Lt. Kim paid Davis no notice when he appeared.  When Davis approached the officers in the backyard, they mentioned the earlier gunfire which Davis acknowledged.  No one asked Davis for consent to search.  The message conveyed to Davis was that the officers were going to search his backyard until they found the shell casings. While Davis may have retained freedom of movement and even shined his own cell phone light on the ground his actions did not imply voluntary consent.  He was a man on federal supervision who acquiesced to law enforcement's warrantless search of his backyard.  Davis did not consent to that search.  The only time Davis was asked to consent was when Lt. Kim asked for consent to secure the shell casings that were found pursuant to a warrantless search of the backyard.  Davis' response was not a consent to the search.

Based on the record before the Court, Davis did not consent to the search of his backyard.

## II.F.   Evidence is admissible in supervised release case

The Government asserts that the exclusionary rule does not apply to revocation hearings.  Davis disagrees.

Generally, circuit courts have held that the costs of applying the exclusionary rule in the revocation context dwarf the negligible deterrence benefit.  Virtually all courts have held that illegally obtained evidence may be relied upon as a basis for revocation of various types of post-conviction supervision. *See United States v. Charles,* 531 F.3d 637, 640 (8th Cir.

2008) (the exclusionary rule generally does not apply in revocation of supervised release proceedings); *United States v. Hebert,* 201 F.3d 1103, 1104 (9th Cir. 2000) (same); *United States v. Armstrong,* 187 F.3d 392, 393 (4th Cir. 1999) (same); *United States v. Montez,* 952 F.2d 854, 857-59 (5th Cir.1992) (absent a showing of harassment by police, the exclusionary rule does not apply to revocation of supervised release hearings); *United States v. Alexander,* No. 97-3089, 1997 WL 592807, at *1 (6th Cir. Sept. 24, 1997) (exclusionary rule does not apply in supervised release revocation proceedings); *United States v. Bazzano,* 712 F.2d 826, 832-34 (3d Cir. 1983) (per curiam) (exclusionary rule inapplicable to evidence illegally seized by police that was used at probation revocation proceeding); *United States v. Farmer,* 512 F.2d 160, 162 (6th Cir. 1975) (same); *United States v. Brown,* 488 F.2d 94, 95 (5th Cir 1973) (per curiam) (same); *United States v. Hill,* 447 F.2d 817, 818-19 (7th Cir. 1971) (same).

Davis argues that in *Scott*, the Supreme Court "emphasized the 'flexible, administrative nature of parole revocation proceedings' and found that application of the exclusionary rule would be incompatible with the nature of such proceedings." (Doc. 64 at 5.) Davis added that in a more recent case, the Court established that revocation hearings "cannot be considered 'flexible' or 'administrative' in nature," which "calls into question the ruling of *Scott* as appli[ed] to Supervised Release revocation proceedings." *Id.* (citing *Esteras v. United States*, 606 U.S. 185, 201 (2025).)

Notwithstanding the foregoing arguments, Davis does not dispute the holdings in *Scott* and *Charles*. Because this Court is bound by prevailing Eighth Circuit law, the undersigned must recommend that Davis' Motion to Suppress in his supervised release case be denied.

## II.G.   Other Motions

As to Davis' Motions to Compel disclosure of ShotSpotter technology information in both pending cases, the undersigned finds that the requests are mooted considering the Court's findings related to the admissibility of the evidence seized in each of the cases. Additionally, the standard for consideration of the reliability of the ShotSpotter technology as it relates to Lt. Kim's reliance on the ShotSpotter reports is that of an objectively reasonable officer.  Lt. Kim was trained on the use of the technology.  He also had prior experience with the use of the technology in other cases wherein the ShotSpotter reports were found to be accurate.

Finally, in consideration of the findings herein, it will be further recommended that Davis' Motion to Dismiss on Second Amendment grounds be found moot.

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that as to Case No. 1:24-CR-41-SNLJ-ACL, the Defendant's Motion to Suppress Evidence (Doc. 32) be **granted**.

**IT IS FURTHER RECOMMENDED** that the Motions to Compel (Doc. 33) Dismiss (Doc. 34) in Case No. 1:24-CR-41-SNLJ-ACL be **found moot**.

**IT IS FURTHER RECOMMENDED** that as to Case No. 1:23-CR-47-SNLJ-ACL, the Defendant's Motion to Suppress Evidence (Doc. 27) be **denied**.

**IT IS FURTHER RECOMMENDED** that as to Case No. 1:23-CR-47-SNLJ-ACL, the Defendant's Motion to Compel (Doc. 28) be **found moot**.

Further, the parties are advised that they have until December 26, 2025, to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

 Dated this 12th day of December, 2025.

> s/*Abbie Crites-Leoni*
> ABBIE CRITES-LEONI
> UNITED STATES MAGISTRATE JUDGE